UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER LEE TOVAR<br><br>        Plaintiff,<br><br>   v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | No. 2:18-cv-00102-KJN<br><br>ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 15, 26) |

Plaintiff seeks judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. In her motion for summary judgment, Plaintiff contends that the Administrative Law Judge presiding over her hearing erred by failing to: (A) make a specific finding of fact regarding Plaintiff's urinary frequency and also failing to provide sufficient reasons for discrediting her treating urologist; and (B) failing to credit the opinion of her treating psychiatrist regarding certain mental impairments. The Commissioner filed a cross-motion for summary judgment, arguing that the ALJ adequately addressed Plaintiff's urination issue in determining her RFC, and he properly discounted the two treating physicians' opinions.

After carefully considering the parties' written briefing, the Court's record, and the applicable law, the Court DENIES Plaintiff's motion for summary judgment, GRANTS the Commissioner's cross-motion, and AFFIRMS the final decision of the Commissioner.

1

# I. BACKGROUND AND ALJ'S FIVE–STEP ANALYSIS[1]

Plaintiff was born on September 3, 1977. (Administrative Transcript ("AT") 34.) She has worked as an insurance benefits coordinator for Blue Shield and as a senior teller for a bank. (AT 323–24.) On February 18, 2014, Plaintiff applied for Disability Insurance Benefits ("DIB"), alleging that since January 25, 2014, she had been unable to work due to the following disabilities: interstitial cystitis ("IC"), irritable bowel syndrome, attention deficient hyperactivity disorder ("ADHD"), bipolar disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD"). (AT 21, 23, 375.) Plaintiff's application was denied on April 14, 2014, and again upon reconsideration on June 10, 2014. (AT 21.)

Aided by an attorney, Plaintiff sought review of these denials before an Administrative Law Judge ("ALJ"). (AT 21.) At a July 14, 2016 hearing, the ALJ heard testimony from Dr. Peter Garbeff, Plaintiff's treating urologist. (AT 344–45.) At a November 22, 2016 hearing, Plaintiff testified as to her conditions; Dr. Arnold Ostrow testified as to his review of Plaintiff's medical records; and a vocational expert ("VE") testified as to Plaintiff's ability to perform certain work. (AT 21, 31.)

///

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401 et seq. Disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. § 423(d)(1)(a). A parallel five-step sequential evaluation governs eligibility for benefits. See 20 C.F.R. §§ 404.1520, 404.1571—76; Bowen v. Yuckert, 482 U.S. 137, 140—42 (1987). The following summarizes the sequential evaluation:
> **Step one**: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> **Step two**: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> **Step three**: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> **Step four**: Is the claimant capable of performing her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
> **Step five**: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995). The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

On December 20, 2016, the ALJ issued a decision finding that Plaintiff was not disabled during the relevant period. (AT 35.) As an initial matter, the ALJ determined that Plaintiff met the insured status requirements of the Act for purposes of DIB through December 31, 2018. (AT 23.) At step one, the ALJ concluded Plaintiff had not engaged in substantial gainful activity since January 25, 2014, Plaintiff's alleged disability onset date. (Id.) At step two, the ALJ found that Plaintiff had the following severe impairments: IC, IBS, affective disorder, bipolar, anxiety, asthma, PTSD, and obesity. (AT 23.) However, the ALJ determined at step three that these impairments did not meet or medically equal the severity of an impairment listed in Appendix 1. (AT 24–25, citing 20 C.F.R. Part 404, Subpart P, Appendix 1.) The ALJ found Plaintiff had the residual functional capacity ("RFC") to perform light work within the following parameters:

> [S]tand and/or walk for 6 hours of an 8 hour work day, sit for up to 6 hours of an 8 hours [sic] work day, with normal breaks; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, crouch, kneel, or crawl; should avoid concentrated exposure to poorly ventilated areas; should avoid all concentrated exposure to irritants such as fumes, odors, dust, and gases (due to asthma); should avoid concentrated exposure to poorly ventilated areas; should avoid all exposure to hazardous machinery; should avoid all exposure to unprotected heights; work is limited to simple . . . routine and repetitive tasks; work should only involve low stress jobs with only occasional changes in the work setting and with only occasional interaction with the general public, coworkers, and supervisors; should have ready access to restroom within 100 yards or 2 minutes.

(AT 25–26.) Regarding Plaintiff's IC, the ALJ reached this conclusion by examining evidence in the record suggesting that stress exacerbated Plaintiff's incontinence, but that it otherwise was too inconsistent to quantify the frequency of her need to urinate. (AT 27, 36, 722.) Additionally, the ALJ assigned great weight to the opinion of Dr. Ostrow, a consultative physician, and only reduced weight to the opinion of Dr. Garbeff, her treating physician. (AT 31−32.) Regarding Plaintiff's mental impairments, the ALJ accorded great weight to the opinion of Dr. Bradley Daigle, a consultative examining psychiatrist, and assigned reduced weight to a medical source statement ("MSS") provided by Dr. John Yarbrough, Plaintiff's treating psychiatrist. (AT 30-31, 33.) At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work, but could perform other jobs as existed in significant numbers in the national economy. (AT 33–34.) Thus, the ALJ concluded that Plaintiff was not disabled for the relevant period.

(AT 48.)

On November 20, 2017, the Appeals Council denied Plaintiff's request for review. (AT 1–7.) Plaintiff timely filed this action requesting judicial review of the final decision; the parties filed cross–motions for summary judgment, and Plaintiff filed a reply. (ECF Nos. 1, 15, 26, 27.)

**II.  LEGAL STANDARD**

The Court reviews the Commissioner's decision de novo, and should reverse "only if the ALJ's decision was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard." Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017). Substantial evidence is more than a mere scintilla, but less than a preponderance; i.e. "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Id. "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008). Further, the court may not reverse the ALJ's decision on account of harmless error. Buck, 869 F. 3d at 1048.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201–02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Generally speaking, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining physician's opinion. Holohan, 246 F.3d at 1202.

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the Court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. A contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. Lester, 81 F.3d at 830–31. An ALJ provides specific and legitimate reasons by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [an] interpretation thereof, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted); see also

Morgan, 169 F.3d at 601–02.

### III. ISSUES PRESENTED

Plaintiff contends the ALJ's decision, as detailed above, is not supported by substantial evidence. First, Plaintiff argues that the ALJ improperly applied Social Security Ruling 15-1p ("SSR 15-1p," which outlines the proper process for analyzing an IC claim) by failing to make a specific factual finding regarding Plaintiff's urinary frequency. Further, Plaintiff argues that the ALJ erroneously discounted: (A) the opinions of Dr. Garbeff, a board-certified urologist who diagnosed Plaintiff with IC and has treated her for the condition since 2010; and (B) the opinion of Dr. Yarbrough, a psychiatrist who treated Plaintiff from 2013 through 2014 for, among other things, bipolar, anxiety, and PTSD. (AT 768.) Plaintiff requests that the Court remand, directing the ALJ to make such a finding, so a VE can then consider Plaintiff's urinary frequency when expounding on the number of jobs available to her. (ECF No. 15 at 16.)

The Commissioner opposed, arguing the ALJ adequately addressed Plaintiff's need to urinate in formulating her RFC. The Commissioner also contends that the ALJ properly detailed his rejection of the two treating physicians' opinions. Thus, the Commissioner maintains the decision should be affirmed.

### IV. DISCUSSION

**A. The ALJ sufficiently resolved the issues concerning Plaintiff's IC.**

Before the ALJ reached Plaintiff's RFC, he found that Plaintiff had a severe MDI of IC. (AT 23, 36.) After finding her condition was not severe enough to equal a listed impairment, the ALJ then undertook a lengthy analysis to determine Plaintiff's RFC, considering Plaintiff's self-reported symptoms in light of the objective medical evidence. (AT 24–33.) Plaintiff argues the ALJ (1) failed to provide a specific finding on urinary frequency and (2) failed to give specific and legitimate reasons for discrediting Dr. Garbeff, Plaintiff's treating urologist. Lester, 81 F.3d at 830–31. However, the Court finds the ALJ did in fact make a sufficient finding regarding Plaintiff's urinary frequency. Further, the ALJ's decision to give "reduced weight" to Dr. Garbeff's opinion was sufficiently detailed, and was legitimately supported by other medical records, other physicians' opinions, and the portions of Plaintiffs' testimony concerning her daily

activities. (AT 31.)

**1. The ALJ made a sufficient finding regarding Plaintiff's urinary frequency.**

"The Commissioner issues Social Security Rulings to clarify the Act's implementing regulations and the agency's policies." Holohan v. Massanari, 246 F.3d 1195, 1203, fn. 1 (9th Cir. 2001). While Social Security rulings "do not have the force of law," courts give them some deference because "they represent the Commissioner's interpretation of the agency's regulations." Id.; see also Bunnell v. Sullivan, 947 F.2d 341, 346, fn. 3 (9th Cir. 1991).

SSR 15-1p provides ALJs "guidance on how we develop evidence to establish that a person has a medically determinable impairment ["MDI"] of [IC], and how we evaluate IC in disability claims" under Title II of the Act. SSR 15-1p, 2015 WL 1292257 at *1. The ruling further details symptoms, laboratory and other findings, and related conditions that are indicative of IC. Id. at *3-5. Once it is determined that a claimant has IC, the ALJ must evaluate whether that MDI is severe enough to render the claimant disabled—via the five–step process detailed in fn.1. Id. at *7. In short, the ALJ must first determine whether the claimant's MDI is severe; if the answer is yes, the ALJ must decide whether it is severe enough to equal the severity of a listed impairment. If the claimant's MDI does not meet a listed impairment, the ALJ must then assess the claimant's RFC. Id. at *8. In determining a claimant's RFC, ALJs must review "all of the relevant evidence in the record," and "consider all of the person's impairment-related symptoms in deciding how such symptoms may affect functional capacity." Id. The ALJ then considers whether the claimant is capable of performing past relevant work and, if not, whether he or she is capable of performing other occupations. Id.

Plaintiff takes issue with the ALJ's synthesis of her RFC, arguing that he failed to make a specific factual finding regarding her urinary frequency. (ECF No. 15 at p. 10.) However, the Court notes that SSR 15-1p does not explicitly require a specific factual finding regarding urinary frequency; it simply requires the ALJ to "consider all of the person's impairment-related symptoms in deciding how such symptoms may affect functional capacity." SSR 15-1P at *8. Cf. Stevens v. Astrue, 2010 WL 889966, at *3 (W.D. Wash. March 10, 2010) (remanding for ALJ's failure to make specific finding regarding plaintiff's "need to alternate sitting and

standing," where social security ruling governing plaintiff's condition explicitly required such a finding); Torres v. Chater, 1996 WL 88078, at *3 (9th Cir. 1996) (remanding where ALJ failed to make "specific finding as to the frequency of [plaintiff's] seizures," as was required by Listed Impairment 11.02, Epilepsy).

Given this, the Court finds that the ALJ made a sufficient finding as to Plaintiff's urinary frequency by stating it "varie[d] greatly" and thus was not severe enough to warrant an additional limitation in the RFC. To reach this conclusion, the ALJ analyzed the medical record at length, and took into consideration testimony offered by Plaintiff, Dr. Garbeff, and Dr. Ostrow. The ALJ also discussed Plaintiff's ability to drive, which suggested "she has some ability to control her need to go to the restroom and the exact duration is again unknown." (Id., emphasis added.) The ALJ concluded that "the frequency of [Plaintiff's] need to urinate varies greatly through the [record]" and that the record indicated "stress makes the need to go more often worse." (AT 36.)

The Court finds that, although the ALJ did not explicitly spell out his conclusion on frequency, his ultimate finding was clear: Plaintiff's IC was not severe enough to further limit her RFC because of frequent IC flaring. Given that it is Plaintiff's burden to demonstrate otherwise, the ALJ's decision suffices. Bowen, 482 U.S. at 146 n.5 (The claimant bears the burden of proof in the first four steps of the sequential evaluation process); see Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001) (An ALJ must "simply . . . discuss and evaluate the evidence that supports his or her conclusion;" he or she is not required to "do so under the heading 'Findings'"); Ramirez v. Astrue, 373 Fed. Appx. 709, 710 (9th Cir. 2010) ("Although the ALJ did not explicitly state the number of bathroom breaks [plaintiff] would need to take over the course of a work day," the court reviewed record and surmised that "ALJ's conclusions were based upon a finding that [plaintiff] required five or fewer bathroom breaks a day").

### 2. The ALJ's RFC was supported by substantial evidence, and specific and legitimate reasons were provided for discrediting the treating urologist.

Related, Plaintiff contends the ALJ failed to provide specific and legitimate reasons for discrediting Dr. Garbeff's ultimate opinion regarding Plaintiff's IC: that Plaintiff could not work due to the frequency of her flare ups. (AT 31, citing 347.) The ALJ ultimately gave little weight

7

to this opinion for multiple reasons. (Id.)

First, the ALJ found this conclusion contradicted by the Doctor's own medical reports and testimony. (AT 31.) The ALJ noted that Plaintiff saw Dr. Garbeff on several occasions—in April, July and November 2015, and February 2016 regarding her alleged IC flares. (AT 28, citing 977, 987, 1032, 1059.) Dr. Gerbeff's treatment notes from the April/July 2015 and February 2016 visits indicated that Plaintiff's "voids," i.e., instances of urination, were "okay." (AT 977, 987, 1059.) Similarly, the notes from the November 2015 visit did not reflect any issues with Plaintiff's voids. (AT 1032.) Further, at the hearing, Dr. Garbeff testified that Plaintiff's IC principally involved increased pain, and did not affect Plaintiff's urinary frequency. (AT 347.) The ALJ also gave little weight to a June 2014 MSS prepared by Dr. Garbeff, which claimed Plaintiff suffered from a "constant sensation to void," because it was "largely conclusory in nature and is unsupported by the activities of daily living" and the medical record. (Id., citing 764.) A conflict between a treating physician's opinion and his or her own treatment notes is a legitimate reason to discredit that physician's opinion. See Valentine v. Commissioner of Social Sec. Admin., 574 F.3d 685, 692–93 (9th Cir. 2009) (holding ALJ properly rejected treating physician's opinion where it conflicted with physician's own treatment notes, which indicated plaintiff's "improved functioning at work"); Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider"); Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (finding conflict between physician assistant's treatment notes and opinion was a germane reason to reject that opinion).

As to other physicians' opinions,, the ALJ considered Dr. Ostrow's testimony, given at the second hearing. Dr. Ostrow acknowledged that Plaintiff would need to be within 100 yards or two minutes of a restroom. (AT 32, citing 307.) However, Dr. Ostrow noted that he found little objective medical evidence supporting Plaintiff's claims regarding urinary frequency "and admitted it is very subjective and not easily measured." (Id., citing 308.) The ALJ assigned Dr. Ostrow's opinion great weight, explaining that, while non-examining physicians are typically entitled to less weight than treating physicians, Dr. Ostrow's testimony was persuasive because

"he has an understanding of social security disability programs and evidentiary requirements" and "[m]ost importantly, his opinion . . . [was] well–supported by the objective medical evidence." (AT 32.) See Magallanes, 881 F.2d at 751-52 (ALJ properly relied on testimony of non–examining physician, in combination with conflicting evidence in the medical record, to discredit treating physician's opinion).

The ALJ also discounted Dr. Garbeff's "could not work" opinion because it was inconsistent with Plaintiff's level of daily functioning, as reported to Dr. Daigle, a consultative examining psychiatrist. The ALJ concluded that Plaintiff's ability to drive herself places, shop, and perform other "errands and light chores and laundry," entailed "physical . . . abilities . . . necessary for obtaining and maintaining employment." (AT 26–27.) A conflict between a physician's opinion and a claimant's activities of daily living is a legitimate reason to discount that opinion. See Morgan v. Commissioner of Social Security, 169 F.3d 595, 601–02 (9th Cir. 1999) (affirming ALJ's decision, where ALJ relied on plaintiff's daily activities in rejecting plaintiff's claims of more severe limitations). The ALJ further referenced Dr. Daigle's note that Plaintiff "was thinking of the possibility of trying to find some work she could do at home because of her urinary problems." (AT 27, citing 1126.) Plaintiff's interest in seeking employment is reasonably inconsistent with complete disability. See Bray v. Commissioner of Social Security Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (affirming ALJ's conclusion that plaintiff's search for employment undermined her disability claim); Carpenter v. Colvin, 2014 WL 4795037, at *10 (E.D. Cal. September 25, 2014) ("[H]olding oneself out as available for full-time work has been considered inconsistent with allegations of disability").

Although Plaintiff argues that the ALJ improperly rejected Dr. Garbeff's opinion in favor of that of Dr. Ostrow, a non-examining physician, the ALJ did not rely on Dr. Ostrow alone to discount Dr. Garbeff's opinion. Rather, the ALJ noted the glaring conflict between Dr. Garbeff's opinion and his own treatment notes and Plaintiff's activities of daily living. Insomuch as Plaintiff denied (at the hearing) that she ever looked for work, (AT 317.), it was for the ALJ to determine her credibility. See Edlund, 253 F.3d at 1156. Accordingly, the ALJ provided specific and legitimate reasons for discounting Dr. Garbeff's opinion.

9

Given the evidence in the record and the ALJ's resolution of conflicts, the Court finds that substantial evidence supports the ALJ's conclusion regarding Plaintiff's urinary frequency. Morgan, 169 F.3d at 601–02 (ALJ gave specific and legitimate reasons for rejecting opinions that claimant could not work on sustained basis or cope with social aspects of daily living by detailing evidence in the record suggesting that Plaintiff maintained his hygiene, was cooperative, and had friends).

**B. The ALJ properly weighed the evidence in discounting the opinion of Dr. Yabrough.**

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for discounting the opinion of Dr. Yarbrough, Plaintiff's treating psychiatrist, regarding her mental condition and ability to work. (ECF No. 15 at 21–22.) As discussed below, Dr. Yarbrough's opinion conflicted with other evidence in the record; therefore, the ALJ needed to provide specific and legitimate reasons for rejecting it. Lester, 81 F.3d at 830–31. The Court finds that the ALJ properly discharged his obligation.

On June 24, 2014, Dr. Yarbrough completed a three-page MSS, which explained that Plaintiff suffered from, among other things, depression, mood instability, anxiety, and PTSD. (AT 768.) He opined that her overall prognosis was "poor." (Id.) On the following page of the MSS, which included a series of checkboxes, Dr. Yarbrough checked as "poor" Plaintiff's abilities in the following areas: "Relate to co-workers," "Deal with Public," "Use of Judgment," "Interact with Supervisor(s)," "Deal with Work Stress," and "Maintain Attention/Concentration." (AT 769.) He rated as "fair" Plaintiff's ability to "Follow Work Rules" and "Function Independently." (Id.) Dr. Yarbrough further rated as "poor" Plaintiff's abilities to: "Understand, remember, and carry out complex, detailed, and simple job instructions," "Maintain personal appearance," "Behave in an emotionally stable manner," "Relate predictably in social situations," and "Demonstrate reliability." (AT 771.) He ended the MSS by opining that "[o]ngoing depression and anxiety have led to poor executive function regarding [Plaintiff's] ability to relate to others, perform simple work tasks, and focus." (Id.) When the form directed Dr. Yarbrough to describe the medical findings supporting his opinion, he wrote "see progress notes." (Id.)

///

The ALJ, in reaching his decision, accorded Dr. Yarbrough's opinion "[l]ittle weight" because the MSS was "primarily a checkbox form with no analysis or explanation to support it." (AT 33.) An ALJ "may 'permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions.'" See Molina, 674 F.3d at 1111, citing Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (holding ALJ properly rejected treating psychiatrist's opinion, which "consisted primarily of a standardized, check-the-box form in which she failed to provide supporting reasoning or clinical findings"); see also Revels v. Berryhill, 874 F.3d 648, 671 (9th Cir. 2017); Raisor v. Commissioner of Social Security, 2017 WL 4270052, at *4 (E.D. Cal. September 26, 2017).

Plaintiff contends that Dr. Yarbrough's MSS was more than a checkbox form because it contained a narrative section in which Dr. Yarbrough referred the reader to his treatment notes. (ECF No. 15 at 21.) However, the ALJ did not reject Dr. Yarbrough's opinion solely because it was a checkbox form. See Garrison v. Colvin, 759 F.3d 995, 1013 (9th Cir. 2014) (holding ALJ improperly rejected opinion of treating neurologist for sole reason that he provided no medical rationale for his checkbox conclusions, where neurologist treated plaintiff for two years and also provided ALJ with treatment notes). Rather, the ALJ further discounted Dr. Yarbrough's opinion because it was inconsistent with the medical record and Plaintiff's daily activities. (Id.); see also Molina, 674 F.3d at 1110–11 (ALJ properly rejected checkbox form as inconsistent with medical record and plaintiff's daily activities). The Court agrees that Dr. Yarbrough's MSS was inconsistent with the record and Plaintiff's daily activities.

The ALJ accorded great weight to Dr. Daigle, a consultative examining psychiatrist who saw Plaintiff in August 2016. (AT 30, citing 1124.) Dr. Daigle's report conveys that Plaintiff drove herself to the appointment and arrived on time. (Id., citing 1125.) During this visit, Plaintiff explained that she suffered postpartum depression in 2002, for which she received no treatment. Shortly thereafter, Plaintiff experienced one manic episode, which resulted in hospitalization. (Id.) Although this was Plaintiff's only manic episode, she was diagnosed with bipolar disorder. (Id.) She was treated with Zyprexa and, after a year, switched to Seroquel, which she has taken continuously since 2004. (Id.) Plaintiff reported no subsequent manic

episodes or hospitalizations, but did state that she sometimes felt "weird" when she stopped taking Seroquel. (Id.) She also reported no family history of bipolar. (Id.) Dr. Daigle ultimately concluded the bipolar diagnosis was not "completely and formerly established." (AT 31, citing 1129.) However, Plaintiff reported some recent depression due to her IC, which caused her to become less active, stop working, and gain weight. (Id., citing 1125.) She claimed she had no suicidal thoughts, but admitted to crying "occasionally." (Id.) Additionally, she reported seeing a psychiatrist until 2012, but that "she had not recently been in any regular mental health treatment." (Id.) However, she reported taking Klonopin for anxiety or sleep as needed, in addition to Seroquel, but "did not recall having received any actual mood stabilizers except possibly for a trial of Lamictal at one point in the past." (Id.) During her visit with Dr. Daigle, Plaintiff also reported that she partook in the daily activities detailed in Section (A)(2) above. She further reported that she got along well with family, went out on her own, raised two well-adjusted daughters, watched television, and handled her own self-care, bills and money. (AT 26, citing 1126.) The ALJ concluded that these activities entailed "mental abilities and social interactions" necessary for "obtaining and maintaining employment." (Id.)

The ALJ reasonably determined these activities of daily living were inconsistent with Dr. Yarbough's MSS. For instance, Plaintiff's ability to raise two well-adjusted children, get along with family, and go out on her own reasonably conflicted with "poor" functioning in interaction with the public, coworkers, and supervisors. See Johnson v. Astrue, 303 F. App'x 543, 545–46 (9th Cir. 2008) (affirming denial of benefits in part because the ALJ discredited claimant's testimony against backdrop of his ability to perform daily-living activities, including caring for a young child by himself, using public transportation, going for walks, and grocery shopping weekly); Thomas v. Astrue, 2010 WL 144834 (E.D. Cal. Jan. 11, 2010) (claimant's activities of daily living and work history, namely that she babysat all of her grandchildren and performed childcare in her home as employment, were inconsistent with a disability finding). Moreover, Plaintiff's ability to perform her own self-care reasonably contradicted Dr. Yarbough's claim that Plaintiff could not maintain her personal appearance. Further, an ability to watch television reasonably conflicted with a "poor" capacity to maintain concentration and attention. See

1    Morgan, 169 F.3d at 601-02 (ALJ provided specific and legitimate reasons for rejecting treating
2    physician's findings of marked limitations in daily functioning by analyzing Plaintiff's daily
3    activities, which indicated milder impairment).
4         Dr. Daigle ultimately concluded Plaintiff had a Global Assessment of Functioning
5    ("GAF") score of 60, which indicated moderate symptoms, and that she was "doing reasonably
6    well" with her current medications, although she did experience "some situational depression."
7    (AT 31, citing 1128–29.) Plaintiff's prognosis was "fair to good," with mild limitations in
8    "ability to relate and interact with supervisors, co-workers, and the public, maintain concentration
9    persistence and pace, and moderately limited in her ability to "associate with day-to-day work
10   activity, including attendance and safety, as well as in her "ability to adapt to the stresses
11   common to a normal work environment." (Id.) Again, Dr. Daigle's conclusions directly
12   contradicted Dr. Yarbrough's contention that Plaintiff's ability to interact with coworkers and
13   supervisors was poor; they also contradicted Dr. Yarbrough's claim that Plaintiff could not cope
14   with work-associated stress, use her judgment, or maintain concentration. The ALJ was entitled
15   to resolve those conflicts. Edlund, 253 F.3d at 1156.
16        In further concluding that Plaintiff did not suffer any disabling mental impairments, the
17   ALJ analyzed Plaintiff's visits to Sutter Health in 2014. (AT 28.) Specifically, the ALJ noted
18   that, although Plaintiff was diagnosed with bipolar and PTSD, her medication for these conditions
19   had kept her stable for "years." (Id., citing 858, 861.) Moreover, he pointed to Plaintiff's
20   doctor's observation that Plaintiff was "alert, fully oriented and with normal motor function."
21   (Id., citing 859.) He further acknowledged Dr. Garbeff's treatment notes from an April 2015 visit
22   with Plaintiff, which contained a normal mental status evaluation. (AT 28, citing 980.)
23   Plaintiff's long-term stability with mental health medication, as well as the two normal mental
24   health evaluations, reasonably contradicted Dr. Yarbrough's MSS, which suggested active,
25   ongoing mental instability. See Andrews v. Shalala, 53 F.3d 1035, 1042-43 (9th Cir. 1995)
26   (upholding ALJ's rejection of examining psychologist's opinion where there was "legitimate
27   conflicting testimony" in the record, and ALJ pointed to other conflicting medical opinions).
28   ///

In sum, it is the ALJ who "is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund, 253 F.3d at 1156 (citation omitted). Moreover, even "when the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld." Morgan, 169 F.3d at 601. Here, the ALJ provided specific and legitimate reasons for according reduced weight to Dr. Yarbrough's opinion. First, he pointed to the conclusory nature of Dr. Yarbrough's MSS, which was a checkbox form, unsupported by objective rationale. Further, the ALJ adequately showed that Dr. Yarbrough's opinion, which suggested severe mental illness, was inconsistent with the remainder of the record and Plaintiff's daily activities. This meets the substantial evidence standard, and so the Court concludes the ALJ did not err regarding Dr. Yarbrough's opinion. Buck, 869 F.3d at 1048.

## V. CONCLUSION

The ALJ's decision was free from prejudicial legal error and supported by substantial evidence in the record as a whole. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 15) is DENIED;
2. The Commissioner's cross-motion for summary judgment (ECF No. 26) is GRANTED;
3. The final decision of the Commissioner is AFFIRMED, and judgment is entered for the Commissioner; and
4. The Clerk of Court shall close this case.

IT IS SO ORDERED.

Dated: September 26, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

tova.102